## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**ARTHUR R. DIRKS,**

    **Plaintiff,**

    **v.**

**BOARD OF COUNTY COMMISSIONERS OF
FORD COUNTY, KANSAS, EDWARD W.
ELAM, AND MARTIN BOLMER,**

    **Defendant.**

**Case No. 15-CV-7997-JAR**

## MEMORANDUM AND ORDER

Plaintiff Arthur R. Dirks filed this action under 42 U.S.C. § 1983 against Defendants Board of County Commissioners of Ford County, Kansas ("Ford County"), Edward W. Elam, and Martin Bolmer alleging violations of his First Amendment rights.  Plaintiff alleges that Defendants used threats and intimidation to prevent him from giving testimony at a deposition regarding misconduct of Ford County officials.  This matter comes before the Court on Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 20).  The motion is fully briefed and the Court is prepared to rule.  For the reasons stated in detail below, the Court grants in part and denies in part Defendants' motion to dismiss.

## I.  Legal Standard

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face."[1]  "[T]he complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of

---

[1] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

mustering factual support for *these* claims."[2]  The plausibility standard does not require a showing of probability that a defendant has acted unlawfully, but requires more than "a sheer possibility."[3]  "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[4]  Finally, the Court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[5]

The Supreme Court has explained the analysis as a two-step process.  For the purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but] we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[6]  Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[7]  Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[8]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[9]

---

[2]*Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[3]*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[4]*Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

[5]*Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[6]*Id.*

[7]*Id.* at 679

[8]*Id.*

[9]*Id.* at 678.

## II.     Factual Allegations

Drawing all reasonable inferences in favor of Plaintiff, the following facts are taken from Plaintiff's First Amended Complaint ("Complaint").[10]

From April 19, 2004, until his termination on May 10, 2013, Plaintiff Arthur Dirks was employed as a heavy equipment operator for the Ford County, Kansas, Road and Bridge Division.[11]  As part of his employment duties, Plaintiff was assigned to help clean up dump sites on private property within Ford County.  At all times relevant to this matter, Defendant Martin Bolmer was Supervisor of the Ford County Road and Bridge Division and Plaintiff's immediate supervisor, and Defendant Edward Elam was the County Administrator of Ford County, Kansas.[12]  Bolmer frequently encouraged Plaintiff and other Road and Bridge employees to keep any items they wanted from these clean-up sites and asked employees whether they had found any items for themselves after employees returned from clean-up sites.  Examples of items taken from county clean-up sites, with Bolmer's knowledge and permission, included a water well system, vehicles, a riding lawn mower, and a gooseneck trailer.  Road and Bridge employees understood that county management endorsed this practice of taking personal property from county clean-up sites.[13]

Plaintiff alleges that it was the practice of Ford County officials to sell scrap metal recovered at county clean-up sites to Leikam Metal and Recycling at a below-market price without a competitive bidding process, in contravention of Kansas law.[14]  Additionally, Ford County was reimbursed by the State of Kansas per ton of scrap metal recovered from county

---

[10]*Id.*

[11]Doc. 16 at 2.

[12]*Id.* at 1.

[13]*Id.* at 2.

[14]*Id.* at 6.

clean-up sites up to a maximum of $10,000 per site.  In an effort to manipulate the State of Kansas into paying more than was owed, Ford County officials altered state records to "move" some scrap metal on the records submitted to the State from a clean-up site that exceeded the cap to another clean-up site that did not exceed the cap.[15]

While Plaintiff was working at a clean-up site on property owned by Michael and Monica Alexander, Bolmer called Plaintiff and requested that he bring Bolmer a set of four iron wheels that Bolmer wanted from the Alexander property.  It is unclear whether Plaintiff complied with this request.  In February 2012, Michael and Monica Alexander sued Ford County, Kansas, alleging that Ford County employees wrongfully entered upon the Alexanders' private property without a proper court order, without consent of the landowners, and without notice of the landowners.[16]  The Alexanders further alleged that the County and individual County employees removed and kept their property and took valuable personal property without consent.  The County removed several automobiles from the Alexander property, but according to Ford County landfill employees, none of the Alexander automobiles arrived at the landfill.  One of the vehicles was eventually recovered at the home of a retired Ford County employee, and a trailer belonging to the Alexanders was found at the Road and Bridge shop.

After the Alexanders filed the lawsuit, Bolmer instructed Plaintiff and other County employees to lie regarding whether they took items from clean-up sites for personal use. Specifically, Bolmer told Plaintiff that he was going to have to "learn how to lie," and that Plaintiff was "going to have to put [his] lying shoes on."[17]  Bolmer instructed Plaintiff to tell

---

[15]*Id.*

[16]*Id.* at 3.

[17]*Id.*

attorneys that "you don't remember, you cannot recall, you don't know."[18]  On May 3, 2013,

Plaintiff was given a promotion and pay increase.

      Plaintiff was noticed to appear for a May 10, 2013 deposition in connection with the

Alexander lawsuit.  On May 8, 2013, Plaintiff met with Bolmer and counsel for Ford County to

prepare for his deposition.  Counsel for Ford County asked Plaintiff whether he had seen any

vehicles parked at the Alexander property.  Plaintiff answered that when he arrived on the

property there were no cars, but he saw places where cars had been sitting and were recently

removed.[19]  Bolmer responded to Plaintiff that "you're going to lose your farm over this."[20]

      On May 9, 2013, Plaintiff again met with Bolmer and counsel for the County.  Counsel

showed Plaintiff a list of cars and asked if he had seen any of them on the Alexander property.

Plaintiff again answered that he did not see those cars at the Alexander property, but that he did

see places where cars had been sitting and were recently removed.[21]  Plaintiff also told counsel

that he had seen some of the listed cars and a gooseneck trailer from the Alexander property at

the Ford County Road and Bridge shop.  Bolmer again told Plaintiff that he would lose his farm

over this.[22]  Counsel and Bolmer then showed Plaintiff an aerial photo of Plaintiff's property and

asked him "how would you like it if someone came out and hauled off your stuff?"[23]  Counsel

asked Plaintiff whether he had personally taken any items from the Alexander property during

the clean-up process.  Plaintiff answered that he had, with Bolmer's encouragement, taken some

T-posts from the Alexander property.  Bolmer said to Plaintiff that "you're making life difficult

---

[18]*Id.* at 4.

[19]*Id.*

[20]*Id.*

[21]*Id.*

[22]*Id.*

[23]*Id.* at 5.

for me."[24]  Bolmer also told Plaintiff that he should plead the Fifth at his deposition or else he was going to lose his farm and everything over this.

On May 10, 2013, Defendant Elam, who had learned of Bolmer's discussions with Plaintiff, came to the Road and Bridge shop and fired Plaintiff.[25]  Later that day, Plaintiff was deposed in connection with the Alexander lawsuit.  Plaintiff refused to answer questions, citing his Fifth Amendment privilege.[26]  Bolmer similarly invoked his Fifth Amendment privilege and refused to answer questions during his deposition in connection with the lawsuit.  Ford County ultimately settled the case and paid the Alexanders $500,000.

Plaintiff alleges that if he had not been intimidated into silence, he would have testified in his deposition that Road and Bridge employees were encouraged by county management to take items from county clean-up sites for personal use and that management engaged in the same conduct.[27]  Further, his testimony would have allowed the parties to learn that the scrap metal taken from the Alexander property and other clean-up sites was sold directly to Leikam Metal Recycling for well below market rate, in contravention of state law and county policy requiring property to be disposed via a competitive bidding process with public participation.[28]  Plaintiff also would have testified to the practices by Ford County officials in altering records to manipulate the State of Kansas into paying additional scrap metal reimbursement funds to the County.  Plaintiff alleges that since the termination of his employment and his deposition, the County has continued to harass him for his refusal to lie and mislead in his deposition responses.

---

[24]*Id.*

[25]*Id.*

[26]*Id.*

[27]*Id.*

[28]Doc. 16 at 5.

### III.   Discussion

#### A.   42 U.S.C. § 1983

Pursuant to 42 U.S.C. § 1983, any person who "under color of . . . [law] . . . subjects, or causes to be subjected, . . . any [person] . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  Section 1983 does not create any substantive rights.[29]  Rather, § 1983 provides only a right of action to remedy a violation of a right secured by the Constitution or laws of the United States.[30]  To state a claim for relief under § 1983, a plaintiff must allege "(1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia."[31]  Here, Defendants do not dispute that the Complaint properly alleges that they acted under color of state law.  Instead, Defendants argue that Plaintiff has failed to allege (1) the violation of a Constitutional right and (2) that the participation of Defendants Bolmer and Elam caused the deprivation of any such right.  Additionally, Defendants argue for dismissal of Defendants Bolmer and Elam on the basis of qualified immunity.  Finally, Defendants contend that Ford County should be dismissed from the case because no basis for municipal liability exists here.

#### B.   Violation of a Constitutional Right

The Complaint alleges that Defendants violated his First Amendment rights by coercing him into silence at his deposition for the Alexander lawsuit.  In his Response to Defendants' motion, Plaintiff argues that Defendants' conduct constituted a prior restraint.  A prior restraint

---

[29]*Dixon v. City of Lawton, Okla.*, 898 F.2d 1443, 1447 (10th Cir. 1990).

[30]*Id.*; *Nelson v. Geringer*, 295 F.3d 1082, 1097 (10th Cir. 2002).

[31]*Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002).

on speech is conduct that restricts, or "chills," speech because of its content before the speech is communicated.[32]  By contrast, First Amendment retaliation is "an adverse reaction taken in response to actual speech."[33]  While prior restraints are not unconstitutional per se, any system of prior restraint faces "a heavy presumption against its constitutional validity."[34]

Defendants argue that the Complaint does not allege a plausible deprivation of a Constitutional right for several reasons.  First, Defendants assert that Plaintiff's proposed testimony would not have related to a matter of public concern, and therefore his speech was not protected by the First Amendment.[35]  In the public employment context, the application of First Amendment freedom of speech rights depends in part upon the type of speech at issue.  Where the government seeks to curtail speech related to an employee's official duties or private speech concerning nothing more than a change in the employee's duties, the government need not provide additional justification for the restraint on speech.[36]  By contrast, when a public employee speaks "as a citizen on a matter of public concern," the government must provide an adequate justification for restricting such speech.[37]  "Matters of public concern are 'those of interest to the community, whether for social, political, or other reasons.'"[38]  Further, "[s]peech

---

[32]*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1308 (10th Cir. 2009) (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1209 (10th Cir. 2007)); *O'Connor v. City & Cnty. of Denver*, 894 F.2d 1210, 1220 (10th Cir. 1990) (quoting *Berg v. Health & Hosp. Corp. of Marion Cnty., Ind.*, 865 F.2d 797, 801 (7th Cir. 1989)) ("Governmental action constitutes a prior restraint when it is directed to suppressing speech because of its content before the speech is communicated.").

[33]*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1182 (10th Cir. 2010) (quoting *Brammer-Hoelter*, 492 F.3d at 1209).

[34]*Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975).

[35]Doc. 21 at 15.

[36]*Arndt v. Koby*, 309 F.3d 1247, 1251 (10th Cir. 2002); *see Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").

[37]*Garcetti*, 547 U.S. 410, 418 (2006) (citing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563 (1968)).

[38]*Brammer-Hoelter*, 492 F.3d 1192.

which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import."[39]  Here, the Complaint alleges that Plaintiff was prepared to testify concerning the conduct of County officials in telling subordinates to take personal items from clean-up sites and altering records to collect more money than was owed from the State.  These alleged improprieties on the part of County officials are matters of public concern.  Thus, Plaintiff has alleged that he was prepared to communicate speech that was protected under the First Amendment.

Second, Defendants assert that Plaintiff fails to allege a plausible deprivation of a constitutional right because Plaintiff chose to invoke his Fifth Amendment right not to testify at the deposition.  Throughout their briefs, Defendants assert that Plaintiff merely "chose" to follow the "advice" and "encouragement" of Defendant Bolmer to invoke his Fifth Amendment right not to testify.[40]  Further, Defendants suggest that Plaintiff made his decision to invoke the Fifth Amendment "to avoid alerting law enforcement and drawing attention to his civil and criminal culpability."[41]  This characterization, however, is not consistent with the allegations in the Complaint.  Rather, the Complaint reveals (1) a pattern of instructions by Bolmer to Plaintiff that he should lie at his deposition; (2) multiple thinly veiled threats by Bolmer to Plaintiff that he would "lose his farm over this" after Plaintiff indicated that he was prepared to testify concerning missing items at the Alexander property and items from the Alexander property found at the Road and Bridge shop; (3) a statement by Bolmer to Plaintiff that he was "making life difficult" for Bolmer after Plaintiff indicated that he was prepared to testify that Bolmer encouraged Plaintiff to take items from the Alexander property; (4) instructions by Bolmer,

---

[39]*Dill v. City of Edmond, Okl.*, 155 F.3d 1193, 1201 (10th Cir. 1998) (quoting *Conway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988)).

[40]Doc. 21 at 10–16; Doc. 31 at 5–12.

[41]Doc. 21 at 15.

coupled with a threat concerning Plaintiff's farm, that he should invoke the Fifth Amendment at his deposition; (5) that Defendant Elam, after learning about Bolmer's discussions with Plaintiff, fired Plaintiff on the day of his deposition; (6) that Plaintiff refused to answer questions at his deposition, citing his Fifth Amendment privilege; and (7) that Plaintiff would have testified at his deposition about misconduct by County officials had he not been intimidated by Bolmer and Elam.  These allegations demonstrate that the conduct of Defendants Bolmer and Elam had a chilling effect on the testimony that Plaintiff was prepared to give, and that it was this chilling effect, rather than the fear of incrimination, that led Plaintiff not to speak.

Third, Defendants argue that Plaintiff has not established a First Amendment claim because Bolmer merely suggested that Plaintiff invoke his Fifth Amendment privilege rather than forbidding Plaintiff to speak.  Defendants cite several cases in which courts have held that the threat of prosecution under an obscenity law or a request that a speaker not communicate certain speech does not constitute a prior restraint.[42]  According to Defendants, Plaintiff retained the choice either to testify or not testify after Bolmer suggested he "should" invoke his Fifth Amendment privilege, and he could have discussed the alleged misconduct by government officials at any time after his deposition.  However, unlike the cases Defendants cite, here the Complaint alleges that Plaintiff remained silent not simply because of the fear of criminal prosecution or based on the preference of his employer, but because of the threats he received from his employer to his property and livelihood.  These threats removed the element of choice that distinguishes mere persuasion from a coercive prior restraint.[43]

---

[42]*See Brammer-Hoelter*, 602 F.3d at 1185; *Eckstein v. Melson*, 18 F.3d 1181, 1186 (4th Cir. 1994); *United States v. Inv. Enters., Inc.*, 10 F.3d 263, 275 (5th Cir. 1993).

[43]*See Backpage.com, LLC v. Dart*, 807 F.3d 229, 236–38 (7th Cir. 2015) (explaining that a threat constituting a prior restraint does not become lawful simply because it comes "clothed in what the absence of any threatening language would have been a permissible attempt at mere persuasion"); *Okwedy v. Molinari*, 333 F.3d

Finally, Defendants argue that Plaintiff has not properly alleged the elements of a prior restraint. Defendants contend that a valid First Amendment prior restraint claim requires an administrative or judicial "order[] *forbidding* certain communications" issued before the communications occur.[44]  Further, Defendants argue that Plaintiff must meet the following four elements to establish a prior restraint claim:

> (1) the speaker must apply to the decision maker before engaging in the proposed communications; (2) the decision maker is empowered to determine whether the applicant should be granted permission on the basis of its review of the content of the communication; (3) approval of the application requires the decision maker's affirmative action; and (4) approval is not a matter of routine, but involves 'appraisal of facts, the exercise of judgment, and the formation of an opinion' by the decision maker.[45]

Because Plaintiff has not met these elements, Defendants argue that he has not properly alleged a prior restraint. Certainly, cases involving judicial orders or administrative regulations requiring application procedures are classic examples of prior restraints.[46]  But courts have also found that more informal conduct can rise to the level of a prior restraint, such as where an employer directs an employee not to speak on a certain subject matter.[47]  A prior restraint claim arises where such conduct is intended to "chill" protected speech and the chilling effect is based on "an objectively

---

339, 340–41 (2d Cir. 2003) ("a public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights").

[44]*See Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis in original).

[45]*Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2009) (quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 554 (1975)).

[46]*Alexander*, 509 U.S. at 569 (describing licensing and censorship schemes as classic forms of prior restraint); *Cooper v. Dillon*, 403 F.3d 1208, 1215 (11th Cir. 2005) ("Classic prior restraints have involved judge-issued injunctions against the publication of certain information.").

[47]*See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (explaining that use of "informal sanctions," including "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation," may give rise to a prior restraint); *Brammer-Hoelter*, 602 F.3d at 1185–87; 10 Bus. & Com. Litig. Fed. Cts. § 108:4 Types of Prior Restraints (3d ed. 2015) (citing *Multimedia Holdings Corp. v. Circuit Ct. of Fla., St. Johns Cnty.*, 544 U.S. 1301, 1306 (2005)) ("A prior restraint may take many forms, including . . . informal procedures undertaken by officials intended to chill expression").

justified fear of real consequences."[48]  Here, Plaintiff has alleged that he engaged in protected speech, that Bolmer threatened him multiple times, that Elam terminated his employment shortly before the deposition, and that Plaintiff chose not to speak because of this intimidation.  Thus, Plaintiff has alleged a plausible violation of his First Amendment freedom of speech rights.

### C.      Causation and Participation

Defendants also argue that Plaintiff has not alleged that Defendants Bolmer or Elam participated in conduct that caused an infringement of Plaintiff's Constitutional rights. Defendants contend that Bolmer did not participate in any infringing conduct because his comments to Plaintiff constituted mere advice to invoke his Fifth Amendment privilege not to testify.[49]  Additionally, Defendants assert that the Complaint makes clear that Elam did not participate in urging Plaintiff to invoke his Fifth Amendment privilege.[50]

As the Court has found above, Plaintiff has alleged a plausible deprivation of his First Amendment freedom of speech right based on threats he received to his property and livelihood.[51]  Defendant Bolmer's communication of these alleged threats to Plaintiff demonstrates his participation in the infringing conduct.  As for Defendant Elam, the Complaint does not allege that he communicated threats to Plaintiff.  However, the Complaint alleges that Elam learned of Bolmer's discussions with Plaintiff, and then fired Plaintiff shortly before his deposition.  Further, Plaintiff alleges that his termination by Elam intimidated him into silence at the deposition.  Thus, Plaintiff has plausibly alleged that he did not communicate protected speech because of an "objectively justified fear of real consequences."  Before the termination,

---

[48]*Brammer-Hoelter*, 602 F.3d at 1175 ("a chilling effect on the exercise of a plaintiff's First Amendment rights may amount to a judicially cognizable injury in fact, as long as it 'arise[s] from an objectively justified fear of real consequences'") (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006)).

[49]Doc. 21 at 11–12.

[50]*Id.* at 11.

[51]*See* Part III.B., *supra*.

Bolmer's threats may have appeared unfounded.  The termination by Elam likely confirmed to Plaintiff that Defendants had the capability to impose additional consequences if Plaintiff chose to testify at the deposition concerning government misconduct.  Thus, the termination contributed to the chilling effect on Plaintiff's testimony.  Further, Elam's termination of Plaintiff after learning about the discussions between Bolmer and Plaintiff, and the close temporal proximity of the termination to the deposition, give rise to a plausible inference that the termination was intended to chill Plaintiff's testimony.  Accordingly, the Court finds that Plaintiff has plausibly alleged the participation of Defendants Bolmer and Elam in causing the violation of Plaintiff's First Amendment rights.

### D.      Qualified Immunity

Defendants also argue for dismissal of Bolmer and Elam based on qualified immunity.  In § 1983 damages suits, the individual offending party may be entitled to qualified immunity from liability under certain circumstances.[52]  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."[53]  To this end, qualified immunity shields government officials from liability unless the plaintiff shows (1) the defendant's violation of a constitutional right; and (2) that the right the official violated was "clearly established" at the time of the challenged conduct.[54]  Accordingly, the qualified immunity defense must be resolved "at the earliest possible stage of litigation."[55]  For the Court to resolve the issue of qualified immunity at the earliest possible stage of litigation, the complaint must allege enough facts to make clear the grounds on which the claim rests.[56]

---

[52]*Gomez v. Toledo*, 446 U.S. 635, 639 (1980).

[53]*Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011).

[54]*Id.* at 2080.

[55]*Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008).

[56]*Id.* (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 n.3 (2007)).

The Court has found above that Plaintiff has properly alleged the violation of his First Amendment right to freedom of speech.[57]  Thus, the Court must determine whether the right violated was clearly established at the time of the violation in May 2013.  A government official violates clearly established law when the contours of a right at the time of the challenged conduct are sufficiently clear so that a "reasonable official would understand that what he is doing violates that right."[58]  A plaintiff may establish this prong "by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, 'the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'"[59]  When the clearly established requirement is "properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'"[60]  "[T]he Supreme Court has 'shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional.'"[61]  Most recently, the Supreme Court, in *Mullenix v. Luna*, explained that "[t]he dispositive question 'is whether the violative nature of *particular* conduct is clearly established.'  This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"[62]

Here, the Complaint alleges that Plaintiff refused to testify concerning protected speech because he was intimidated based on the threats by Defendant Bolmer and the termination by

[57] *See* III.B., *supra*.

[58] *Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013) (quoting *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013)); *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

[59] *Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015) (quoting *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015)).

[60] *Robbins*, 519 F.3d at 2085 (quoting *Mailey v. Briggs*, 475 U.S. 335, 341 (1985)).

[61] *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006) (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)).

[62] *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742 (emphasis added); *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

Defendant Elam.  Thus, the Court must determine whether it was clearly established that such conduct violated Plaintiff's constitutional rights.[63]  Defendants do not dispute that at a general level, the law is clearly established that prior restraints are presumptively unconstitutional.[64]  Instead, Defendants argue that the law was not clearly established that the particular conduct at issue here constituted a prior restraint.[65]

In *Bantam Books, Inc. v. Sullivan*, the Supreme Court addressed whether threatening or coercive conduct on the part of the government could give rise to an unconstitutional prior restraint.[66]  The Court held that threats of prosecution by the Rhode Island Commission to Encourage Morality in Youth directed at magazine and book distributors for selling "objectionable" publications, which had the effect of intimidating the distributors, constituted an unconstitutional prior restraint.[67]  Unlike the threats to personal property in this case, the conduct at issue in *Bantam Books* involved threats of criminal prosecution.[68]  However, the *Bantam Books* decision made clear that the use of "threat[s] of invoking legal sanctions and other means of coercion, persuasion, and intimidation" intended to stifle protected speech constitutes a prior restraint.[69]

To be sure, courts have consistently held that government actors may criticize protected speech or request that a person not communicate protected speech, so long as the request is not

---

[63]Defendant argues that the conduct relevant is Defendant Bolmer's suggestion or advice that Plaintiff seek counsel and invoke his right to remain silent. Doc. 21 at 16; Doc. 31 at 12–13.  However, the Court has found above that the violative conduct alleged in the Complaint includes threats and intimidation into silence, rather than mere advice.

[64]*See Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 558–59 (1975) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)).

[65]*See* Doc. 31 at 12.

[66]372 U.S. at  66–70.

[67]*Id.* at 66–72.

[68]*Id.*

[69]*Id.* at 67–68.

accompanied by a threat or coercion.[70]  But the law is equally clear that government officials may not prohibit the communication of protected speech by coupling persuasion or a request not to speak with threats or coercion.[71]  In *Okwedy v. Molinari*, the Second Circuit discussed the effect of coercion in the context of a prior restraint claim:

> What matters is the distinction between attempts to convince and attempts to coerce.  A public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form.[72]

The Court is not aware of any contrary authority suggesting that a request not to speak when combined with a threat or coercion does not constitute a prior restraint, and the parties have provided no such authority.  Although Defendant cites to a case in which the Fourth Circuit held that a government letter threatening prosecution if the plaintiff continued to sell sexually explicit publications was not a prior restraint, that case is readily distinguishable because it

---

[70]*See, e.g.*, *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1185 (10th Cir. 2010) (explaining that an employer does not impose prior restraint by expressing a preference that employee not speak on a certain matter); *Am. Family Ass'n, Inc. v. City & Cnty. of S.F.*, 277 F.3d 1114, 1125 (9th Cir. 2002) ("We agree with the host of other circuits that recognize that public officials may criticize practices that they would have no constitutional ability to regulate, so long as there is no actual or threatened imposition of government power or sanction") (citing *Penthouse Int'l Ltd. v. Meese*, 939 F.2d 1011, 1015–16 (D.C. Cir. 1991); *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85, 89 (3d Cir. 1984)).

[71]*E.g.*, *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983) ("Where comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid [prior restraint] claim can be stated."); *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009) ("Threatening penalties for future speech goes by the name 'prior restraint,' and a prior restraint is the quintessential first-amendment violation.") (citing *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 552–53 (1975)); *Georgine v. Amchem Prods., Inc.*, 160 F.R.D. 478, 511 (E.D. Pa. 1995) ("[G]overnment conduct that takes the form of a 'penalty' or 'sanction' for the utterance of protected expression implicates the First Amendment"); *Zieper v. Reno*, No. 00 CIV. 5594 (RMB), 2002 WL 1380003, at *7 (S.D.N.Y. June 26, 2002), *aff'd in part, dismissed in part sub nom. Zieper v. Metzinger*, 62 F. App'x 383 (2d Cir. 2003) (holding that law was clearly established that First Amendment violation occurred when officers "coerced" plaintiffs into suppression of film that qualified as protected speech).

[72]*Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003).

involved a threat of prosecution for the communication of unprotected speech.[73]  Here, as well as in the cases previously cited, the infringing conduct consisted of threats aimed at discouraging protected speech.

The Court finds that at a general level, the law is clearly established that a prior restraint is presumptively unconstitutional.  More specifically, and relevant to the particular conduct alleged in this case, the Court finds that a government official violates a plaintiff's clearly established First Amendment rights when the official employs threats in an effort to prevent the communication of protected speech.[74]  Further, Plaintiff's right to be free from such threats was clearly established at the time of the alleged conduct in May 2013.  Thus, because the Complaint here alleges that Defendants used threats in an effort to prevent Plaintiff from communicating protected speech, the Court finds that Defendants Bolmer and Elam are not entitled to qualified immunity.

### E.      Municipal Liability

Defendants argue that because no basis for municipal liability exists here, Defendant Ford County should be dismissed from this case.  The Tenth Circuit has articulated the following bases for municipal liability:

> Municipal liability may be based on a formal regulation or policy statement, or it may be based on an informal "custom" so long as this custom amounts to "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law."  Municipal liability may [] also be based on the decisions of employees with final policymaking authority or the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval.  Finally, municipal liability may be based on injuries caused

---

[73]*See Eckstein v. Melson*, 18 F.3d 1181, 1186–87 (4th Cir. 1994) (explaining that secondary effects of enforcing federal anti-obscenity statute, including plaintiff having to remove some protected materials from her shelves based on her "incorrect understanding" of the law, did not give rise to prior restraint claim).

[74]*See Hammerhead*, 707 F.2d at 39; *Okwedy*, 333 F.3d at 344; *Fairley*, 578 F.3d at 525.

by a failure to adequately train or supervise employees, so long as that failure results from "deliberate indifference" to the injuries that may be caused.[75]

Here, Plaintiff asserts two bases for imposing municipal liability on Defendant Ford County. First, Plaintiff contends that Ford County may be held liable because it established a practice or custom of illegally profiting from county clean-up sites and prohibiting employees from speaking about this misconduct.[76]  Second, Plaintiff argues that Defendant Elam, acting as the final policymaker in his role as County Administrator, ratified Defendant Bolmer's unlawful conduct when he terminated Plaintiff.[77]

The Court finds that the practice or custom theory does not give rise to municipal liability based on the allegations in the Complaint.  To give rise to municipal liability, an informal practice or custom must be "so widespread as to have the force of law."[78]  Further, the Tenth Circuit has held that the practice or custom must be "closely related to the violation of the plaintiff's federally protected right."[79]  The Complaint contains the following two allegations related to the relevant practice or custom:

> 54.   Ford County's practice of allowing employees to take personal property from county clean-up sites and demanding those employees to lie or not speak about it is a persistent practice that has the force or effect of municipal policy.
> 55.   Ford County's practice of illegally profiting from county clean-up sites is a persistent practice that has the force or effect of municipal policy.[80]

---

[75]*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)).

[76]Doc. 26 at 8.

[77]*Id.* at 9.

[78]*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403–04 (1997) (citing *Monell v. Dep't Soc. Servs. of City of NY*, 436 U.S. 658 (1978)); *see Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (explaining that a "well-settled custom or practice" may be deemed an official policy or custom for § 1983 municipal-liability purposes).

[79]*Schneider*, 717 F.3d at 770.

[80]Doc. 16 at 7.

The allegation in paragraph 55 does not provide a basis for municipal liability because the County's practice of illegally profiting from county clean-up sites is not "closely related" to the violation of Plaintiff's First Amendment right at issue here.  The allegation in paragraph 54 also does not give rise to municipal liability because it does not indicate a practice "so permanent and well settled as to constitute a 'custom or usage' with the force of law."[81]  The allegation is unclear as to how many employees this practice was applied to, or how many times it was used. The Complaint contains no additional context indicating that the practice of prohibiting employees from speaking about the County's conduct at clean-up sites was so "permanent," "well-settled," or "widespread" that it carried the force of law.  Therefore, the Court finds that the custom or practice theory does not give rise to municipal liability.

The Court also finds that municipal liability based on a ratification theory does not apply here.  "Under this theory, a municipality will not be found liable . . . unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions."[82] Here, the Complaint does not allege that in terminating Plaintiff, Defendant Elam ratified Defendant Bolmer's actions or the basis of his actions.  More importantly, the Court cannot find that Elam was the final policymaker for § 1983 municipal liability purposes.  Whether a government actor is a final policymaker is a question of state law to be decided by the Court.[83] In making this determination, courts consider whether "(1) the official's discretionary decisions are 'constrained by general policies enacted by others;' (2) the decisions are reviewable by

---

[81] *Brammer-Hoelter*, 602 F.3d at 1189.

[82] *Cacioppo v. Town of Vail, Colo.*, 528 F. App'x 929, 933 (10th Cir. 2013) (quoting *Bryson v. City of Okla. City*, 627 F.3d 784, 790 (10th Cir. 2010)).

[83] *Milligan-Hitt v. Bd. of Trs. of Sheridan Cnty. Sch. Dist. No. 2*, 523 F.3d 1219, 1224 (10th Cir. 2008) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 736–38 (1989)); *Dill v. City of Edmond, Okl.*, 155 F.3d 1193, 1211 (10th Cir. 1998) (explaining that courts must determine whether officials are policymakers for the municipality "in a particular area, or on a particular issue") (citing *McMillian v. Monroe Cnty., Ala.*, 117 S. Ct. 1734, 1737 (1997)).

others; and (3) the decisions were within the official's authority."[84]  The Complaint does not allege that Elam was the municipality's final policymaker for purposes of personnel decisions.[85] In his Response, Plaintiff makes the following argument regarding Elam's policymaking authority: "Additionally, Plaintiff alleged that Defendant Elam is the County Administrator (¶ 3). As such, Mr. Elam has final policymaking authority and his decisions can expose Ford County to liability."[86]  Plaintiff does not provide citation to authority—and the Court is not otherwise aware of authority—indicating that county administrators as a matter of law in Kansas are final policymakers with respect to personnel decisions.  To the contrary, the Court is aware of at least one case in which this District held that a city council, rather than the mayor, city administrator, or chief of police, was the final policymaker in the area of personnel decisions.[87] Plaintiff does not refer to any policies or regulations in Ford County indicating that the County has delegated final policymaking authority to Elam in this area.  Thus, the Court cannot find that Defendant Elam, as opposed to Defendant Board of County Commissioners of Ford County, Kansas, was the final policymaker with respect to personnel decisions.  Because the Court finds that municipal liability does not apply in this case, the Court dismisses the First Amendment claim against Defendant Ford County.

## IV.     Conclusion

The Court finds that Plaintiff has plausibly alleged a violation of his right to freedom of speech under the First Amendment based on the chilling effect of the threats made by Defendant Bolmer and the termination by Defendant Elam.  The Court finds that Plaintiff has plausibly

---

[84]*Dill*, 155 F.3d at 1211 (quoting *Randle v. City of Aurora*, 69 F.3d 441, 448 (1995)).

[85]*See* Doc. 16.

[86]Doc. 26 at 9.

[87]*Dempsey v. City of Baldwin City, Kan.*, 333 F. Supp. 2d 1055, 1071 (D. Kan. 2004) *aff'd sub nom. Dempsey v. City of Baldwin*, 143 F. App'x 976 (10th Cir. 2005).

alleged that Defendants Bolmer and Elam participated in causing a chilling effect on Plaintiff's protected speech, thereby causing a violation of Plaintiff's First Amendment right to freedom of speech.  Additionally, Plaintiff's First Amendment right was clearly established at the time of the alleged infringing conduct.  Therefore, the Court finds that Defendants Bolmer and Elam are not entitled to qualified immunity.  Finally, the Court finds that Defendant Ford County cannot be held liable under theories of unconstitutional practice or custom or final policymaker ratification.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion to Dismiss (Doc. 20) is **denied** as it relates to Defendants Martin Bolmer and Edward W. Elam.

**IT IS FURTHER ORDERED BY THE COURT** that Defendants' Motion to Dismiss (Doc. 20) is **granted** as it relates to Defendant Board of County Commissioners of Ford County, Kansas.

**IT IS SO ORDERED.**

Dated: <u>May 23, 2016</u>

       S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE